**Rudolph CLARKE and Edwin Velez, Plaintiffs,**

v.

**UFI, INC. and Thomas Lewis, Defendants.**

**No. 99CV1943(ILG).**

United States District Court, E.D. New York.

May 16, 2000.

John P. Gianfortune, Lake Success, N.Y., for plaintiffs.

Stanley Israel, Long Island City, N.Y., for defendants.

*MEMORANDUM and ORDER*

GLASSER, District Judge.

Plaintiffs Rudolph Clarke and Edwin Velez bring this action against their former employer, UFI, Inc., and Thomas Lewis, one of their supervisors, alleging that they were subjected to workplace sexual harassment and to retaliatory discharge, in violation of Title VII of the Civil Rights Act, as amended, 42 U.S.C. § 2000e et seq., and the New York Executive Law § 296 et seq. Plaintiffs also allege a common law cause of action for intentional infliction of emotional distress. Defendants now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, and in the alternative, for an order of dismissal pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction, and for failure to state a claim. Defendants also move for leave to amend their answer. For the reasons that follow, defendants' motion to amend is granted, their motion to dismiss the cause of action for intentional infliction of emotional distress is granted for failure to state a claim, and their motion for summary judgment is also granted, and the complaint is dismissed.

**BACKGROUND**

Defendant UFI, Inc. (an abbreviation for "Uniforms for Industry") is a New York corporation engaged since 1960 in the business of renting and laundering industrial uniforms. It employs a workforce of several hundred persons in various capacities, including mechanics who service its fleet of delivery vehicles. For most of its existence UFI has been a union shop, and a party to a succession of collective bargaining agreements with the Amalgamated Service and Allied Industries Joint Board, UNITE, AFL—CIO, or its predecessor (hereinafter, the "Union"). Plaintiffs Rudolph Clarke and Edwin Velez were employed at UFI as mechanics and mechanic's helpers. Both men were members of the Union during their tenure at UFI. Clarke began in October, 1997, and continued at UFI until early in 1999. Velez worked at UFI between March, 1997, and July, 1998.

Defendant Thomas Lewis has worked at UFI for around 10 years as the manager of its fleet of vehicles. He hired both Clarke and Velez, and was their supervisor throughout their employment.

The collective bargaining agreement in force when the events at issue transpired [1] (the "CBA") contains several provisions pertinent to this motion. Section 33 states:

> The power of discharge remains with the Employer. The Employer agrees, however, that it shall exercise this power with justice and due regard for the rights of the employees. In the event the Union claims the discharge is unjust, the Union shall submit its complaint to the Arbitrator within five (5) days from the date of discharge and the decision of the Arbitrator shall be rendered within one week from the date of the hearing. If the Arbitrator finds that an employee was unjustly discharged, the Arbitrator may order the employee reinstated with back pay for time lost.

Section 34 contains this provision regarding "Grievance Procedure":

> Complaints shall, in the first instance, be taken up for adjustment by the representatives of the parties hereto. In the event they fail to agree, the matter shall be referred to the Arbitrator for a decision.

Section 35 of the CBA sets forth the procedure governing arbitration of grievances arising under the agreement. After designating Philip Ross as the Arbitrator [2], sec-

---

**1.** The current CBA between the Union and UFI covers the period between November 28, 1996 through November 27, 2000. *See* Exh. B to Deitrich Aff.

**2.** Before his career as a labor arbitrator, Mr. Ross served as Industrial Commissioner of the State of New York.

tion 35 continues, with a statement of the scope of arbitrability:

> Any and all complaints, grievances or disputes arising between the parties hereto under, out of, or in connection with or in relation to this Agreement or in the interpretation, performance, termination or any alleged breach thereof, shall be forthwith referred for arbitration and final determination to the Arbitrator. The Arbitrator is empowered to include in the award mandatory and injunctive relief and to assess damages including interest. Any specific reference in any provision of this Agreement for arbitration shall not be construed as a limitation or a waiver of arbitration with respect to any and all complaints, grievances or disputes arising out of any other terms of this Agreement where no specific reference is made.

CBA, § 35(B) (Exh. A to Deitrich Aff.). The decisions of the Arbitrator are final, under the CBA:

> All determinations, decisions and awards shall be final, conclusive and binding upon all the parties hereto, their heirs, executors, administrators, assigns, or successors in interest and upon any Employer and employee covered by this Agreement.

*Id.* at § 35(D). The CBA further provides that the Arbitrator shall apply New York law, makes various specific provisions for the conduct of arbitration proceedings, and prohibits any "proceeding or action in a court or [*sic*] law or equity or administrative tribunal ... other than to compel arbitration and to enforce an award." *Id.* at §§ 35(D), (H).

Of particular significance for this action is the section immediately following the CBA's arbitration provisions:

> The Union and the Employer recognize the problem of sexual harassment in the workplace and are committed to ending it. Sexual harassment shall be defined as: unnecessary physical contact, touch or patting, suggestive and unwelcome remarks, jokes, comments about appearance and deliberate verbal abuse, leering and compromising invitations, use of pornographic pictures at the workplace, demands for sexual favors and physical assault. Grievances under this clause will be handled with all possible speed and confidentiality. In settling the grievance, disciplinary action may be taken against employees (both bargaining unit and non-bargaining unit) and supervisors who engage in any activity prohibited under this clause.

*Id.* at § 36.[3]

On July 28, 1998, six days after terminating his own employment at UFI, plaintiff Velez filed a grievance with the Union seeking reinstatement to his former position. In his grievance he claimed that he had been "forced out" of his job "because of [a] shift change." (Exh. C to Deitrich Aff.)

Three days later, on July 31, 1998, plaintiff Clarke filed a grievance with the Union alleging as follows:

> Sexual harrasment (sic)—Unnecessary physical contact, touching unwelcomed remarks, jokes, comments about appearance

(Exh. E to Deitrich Aff.) On the same day, Velez filed a second grievance, this time alleging sexual harassment:

---

**3.** In their Statement pursuant to Local Rule 56.1, plaintiffs contend that "UFI did not maintain a written policy for handling complaints of sexual harassment during the relevant time period," Pl.Rule 56.1 Statement at ¶ 8, relying apparently on UFI Vice–President Derrick Miller's deposition testimony. (Miller Dep. at 49.) Inspection of the context of Miller's statement, however, reveals that Miller distinguishes between UFI "policy for in-

ternal complaints of sexual harassment," and UFI policy regarding interactions with the Union, and that Miller regarded all matters pertaining to sexual harassment policy at UFI as "Union" rather than "internal" issues. *See* Miller Dep. at 42–48. In any event, Miller's statement is inaccurate on its face in light of the undisputed fact that the CBA provision on sexual harassment predates the events at issue.

Sexual harrasment (sic): unnecessary physical contact, patting, unwelcomed (sic) remarks

(Exh. D to Deitrich Aff.) It is not disputed that before the filing of these grievances, neither Clarke nor Velez had made any allegation of sexual harassment to anyone at UFI or in the Union.

In accordance with the provisions of sections 35 and 36 of the CBA, the grievances of Clarke and Velez were submitted to arbitration before Philip Ross. Hearings were held on five different days between September and December, 1998. Clarke, Velez, and the Union were at all times represented by counsel. Testimony was taken under oath, subject to cross-examination, and both sides submitted post-hearing briefs. A full transcript of the hearings was made, and has been submitted in part on this motion. Both Clarke and Velez testified on their own behalf, and also called three other witnesses in support of their case. UFI produced the defendant Lewis, and four other UFI employees as witnesses.

On April 15, 1999, Arbitrator Ross issued an Opinion and Award dismissing the claims of both Clarke and Velez in their entirety. The Opinion begins with a summary of the testimony. Velez testified that defendant Lewis had "engaged in various provocative and disturbing acts." (Arb.Op. at 2.) Velez cited in particular Lewis's alleged penchant for " 'touching games ... like touching my shoulders, come next to me, pinch me on the side....' " (*Id.*, quoting Velez.) Velez stated that he would try to walk away, but that Lewis would follow. " 'Most of the time I'd be running around the garage, trying to get away from him.' " (*Id.*) When asked how often these games took place, Velez responded, "pretty much every day." (*Id.*)

Velez charged that Lewis pinched him so hard and so often that marks were left on his body, which when she saw them, caused his wife to suspect him of infidelity. (*Id.*) Velez cited other instances of alleged

harassment by Lewis, including unwanted "bearhugs," an invitation to kiss him, an unsolicited spanking, eavesdropping in the locker room, and various offensive remarks. (*Id.* at 2–3.) Lewis also claimed that a wall in Lewis's office at UFI was covered with "pictures of naked women." (*Id.*)

Velez claimed that he had not complained earlier about Lewis's conduct because of a previous experience with Derrick Miller, an officer at UFI. (*Id.* at 3–4.) Velez claimed that some six years earlier, while Velez was working at a gas station, Miller had offered him $100 to accompany him to a party. (*Id.* at 4.) Velez also claimed that he had tried to raise the issue with two Union officials, but they had belittled his complaints, thrown out a grievance he had actually filed, and assured him that he would get no help with such a grievance. (*Id.*) According to Arbitrator Ross

Velez was both vague and contradictory about the time and subject of his discussions with Sam Velez and Arroyo [the two Union officials with whom he claimed to have complained about sexual harassment, Sam Velez being no relation to the plaintiff Velez]. He continued to insist that he filed a grievance with Sam Velez which was thrown away and that afterwards he spoke to Arroyo and filed another grievance. However he wasn't sure whether the first grievance filed with Sam Velez involved sexual harassment. He acknowledged that his first grievance relating solely to the shift change was filed on July 28 and that his 'harassment grievance was filed on July 31.' He gave various and amorphous answers to the question as to why his sexual harassment grievance followed his first grievance, saying at one point that 'I believe they told me that they both couldn't go under the same, the same grievance, I wasn't aware.' The 'they' was not identified. Another answer to the same question[:] 'Three days after my discharge, the grievance was

filed because after I was discharged, okay, nobody knew what was going on. Meaning, Union didn't know what was going on with me.'

*Id.* Arbitrator Ross concluded that "no matter how pressed Velez was, he was unable to explain his delay in filing the harassment charge other than that he was embarrassed." (*Id.*)

Clarke also testified that Lewis had been in the habit of watching him while he undressed in the locker room. He claimed that Lewis used "constantly" to touch his legs while he was working under vehicles, and once " 'put his arms around my shoulder and he was like squeezing.' " (*Id.* at 5.) Clarke also testified that he had seen Lewis subject Velez to harassment several times, specifically citing incidents in which Lewis had put his hand " 'down the back of Eddie's (Velez) pants.' " (*Id.* at 6.) Clarke, like Velez, also described incidents in which Lewis had said he wanted to kiss him, and had complimented him on his looks and scent. Clarke also described Lewis's office as "full of naked women's pictures." (*Id.*)

Clarke said that he had not complained earlier about Lewis's behavior, "because he had heard that Lewis's boss, Derrick Miller, 'is kind of funny' so that any complaint 'would get nowhere.' " (*Id.*) Finally, Clarke raised, for the first time, allegations that Lewis had made racially derogatory remarks to Velez, and also to him personally. Specifically, Clarke, who is African American, claimed that Lewis had once said to him that "he don't like black and I don't like Puerto Rican and he racist, he told that to me personally." (*Id.*)

Joseph Sbarbaro is a shop steward at UFI, who had assumed Lewis's duties as fleet manager during a five-month absence in 1998 for recuperation from a car acci- dent. (*Id.* at 7.) In support of Clarke and Velez, Sbarbaro testified that he had witnessed Lewis pinching Velez, and saw him eavesdropping on Clarke in the locker room. Sbarbaro also testified to a racially derogatory remark by Lewis directed to Velez, and also described an incident in which Velez came to him enraged by an offensive observation by Lewis concerning Velez's 12–year–old daughter. (*Id.*)[4]

The defendant Lewis acknowledged in his testimony that there were some pictures of naked women on the walls of his office. (*Id.*) He denied pinching or inappropriately touching Velez, while allowing that he was in the habit from time to time of placing his arm on the shoulders of co-workers. (*Id.* at 8.) He denied ever chasing Velez in order to pinch him, but said that he did recall an instance when he had been explaining a point of auto mechanics to Velez and Velez began to walk away, and Lewis found himself following him while trying to complete his explanation. Lewis denied ever putting his hand down Velez's pants, but explained that he did occasionally check mechanics who were working underneath vehicles to make sure they were not sleeping by pulling on their feet or shaking their pants. (*Id.*) As for Velez's daughter, Lewis stated that in response to Velez's once confiding in him over worries about her, Lewis had offered his wife's services as a sitter after school. (*Id.* at 8–9.) Lewis denied giving any UFI employee a bearhug, and denied eavesdropping on any workers, explaining that the locker room is located in immediate proximity to the lunch room. He also denied making racially derogatory remarks. (*Id.*)

Several other witnesses testified, including Derrick Miller, UFI's Vice–President, who denied ever having seen Velez before his hiring by UFI, and denied proposition-

---

4. Sbarbaro was terminated by UFI in January, 1999, and promptly filed a charge with the EEOC alleging discriminatory retaliation. On February 25, 2000, the EEOC informed Sbarbaro that as a result of its investigation, which was based in part on UFI's submission to the EEOC of the arbitration award against Clarke and Velez, the EEOC was "unable to conclude that information obtained establishes violations of the statutes." (Defs. Reply Aff. at Exh. O.)

ing him at a gas station several years before. (*Id.*)

In assessing the testimony, Arbitrator Ross focused on the credibility of the witnesses, explaining that he had resolved credibility issues "partly on the basis of witness demeanor but mostly on the internal consistency of the testimony and the extent to which it is supported by other probative evidence." (*Id.* at 10.)

Turning first to Velez, Arbitrator Ross writes:

> It is easy to evaluate the testimony of Ed Velez. I have listened to thousands of witnesses in the past 30 years and I have rarely encountered such an unbelievable individual. It would take too much time to list all of his false testimony but a few examples are in order. Prominent among these was his claim that he was painfully pinched by Lewis nearly every day and the pinching was so severe that it left marks on his body. And additionally these marks were so prominent that when his wife glimpsed them she promptly left him, apparently considering them to be signs of passionate lovemaking with a woman. His gory tale of other physical abuse is breathtaking as is his excuse for never complaining to the Union or to management. I simply disbelieve his claim that he filed a grievance with Sam Velez some time before he left employment and that Sam destroyed it or threw it away. There is not a scintilla of evidence that Velez is a man so embarrassed by the topic of sexual harassment that it prevented him from complaining to somebody. His excuse that he didn't go to management because of a long past homosexual encounter with Miller years previous to his U.F.I. employment and before the two men ever met is unbelievable.
>
> Velez's testimony is so porous that he doesn't even get his falsehoods straight. His testimony about the alleged encounter with Miller does not have the detail contained in the testimony of Clarke and Sbarbaro, both of whom claimed that he had told them about the incident. Even more striking is Velez' failure to memorize his story about his daughter and Lewis' offer of babysitting. His account of this is so abbreviated as to be meaningless. It is only after the other two witnesses testified is it [sic] possible to make sense of Velez' story. It must be remembered that Clarke and Sbarbaro were testifying about what Velez purportedly told them. It would be more natural for them not to remember the details or even the point of Velez' narration. Velez condemns his veracity both by what he said and what he didn't say. I dismiss entirely Velez' version of the circumstances surrounding his termination as well as his filing the harassment grievance. He has given multiple reasons for his termination which are mutually contradictory and offers no plausible reason for waiting until July 28 to file his grievance. I cannot consider as truthful his account of the events leading to and ending with his July 31 sexual harassment grievance. I do not believe it to be a coincidence that this grievance uses phrases borrowed directly from the contract [i.e., § 36 of the CBA] and simultaneously employed by Clarke in his harassment grievance. Velez' testimony that he wrote this unaided and without consulting anyone is consistent only with the finding that his testimony is worthless.

(*Id.* at 10–11.) Arbitrator Ross then takes up the testimony of Clarke:

> For both similar and other reasons I cannot credit Clarke's version of events. His support of Velez' narration is suspicious in view of my credibility findings recited above but also because of what Clarke testified to about his own experience. I reject completely out of hand that Lewis ever told him that he was a racist. In this day and age for a manager to say this directly to an employee belonging to a minority is imagination run amuck. Clarke's insistence on this is belied by the testimony of all witnesses

none of whom has ever attributed a racist act or derogatory word to Lewis. In confirming so much of Velez' testimony, Clarke has condemned himself. I note that like Velez he has offered no credible explanation as to why he waited until July 31 to file his grievance. Moreover, the phrasing of this grievance with its contractual words is subject to the same incredulity as that of Velez. Again as with Velez, I believe it to be of highest significance that Clarke never uttered a word of complaint to anyone— the Union or management—until at least July 28 and the first step was only made on July 31.

Finally, I must add that Clarke's and Velez' claimed reprisals for failure to comply with Lewis' solicitation are both ridiculous and an obvious fabrication.

*Id.* Arbitrator Ross added these observations on the Sbarbaro testimony:

Sbarbaro's testimony is contaminated in that he swore to events such as Lewis peeking in the locker room which turns out to be in [sic] addition [to] the lunch room, which defuses the force of his charge. His corroboration of incidents testified to by Ed Velez and Clarke is rejected for the reasons cited above.

*Id.*

After being fired in January, 1999, Clarke grieved his discharge, and the matter was submitted for arbitration by the Union. Hearings were held in June and July of 1999, and in December, 1999, Arbitrator Ross denied Clarke's grievance, finding that he had been discharged for just cause. Arbitrator Ross's opinion in support of that finding is the subject of defendants' motion to amend their answer, inasmuch as their amended answer differs primarily by the addition of allegations relating to the proceedings on Clarke's discharge, and by the annexation of the opinion as a second exhibit.

On November 4, and December 4, 1998, Clarke, and then Velez, filed charges of discrimination against UFI with the EEOC. On January 13, 1999, Clarke re-ceived a Right to Sue Letter, and on February 25, 1999, Velez received similar letter, both in advance of the 180–day statutory waiting period. The letters both state that "it is unlikely that the EEOC will be able to complete its administrative processing within the 180 days from the filing of the Charge." (Exhs. J & L to Deitrich Aff.)

## DISCUSSION

I. *Defendants' Motions to Supplement their Pleading, to Dismiss the Title VII Claims Against Lewis, and to Dismiss the Cause of Action for Intentional Infliction of Emotional Distress*

■ Three issues present themselves at the threshold, and may be disposed of summarily. First, defendants have moved to amend and supplement their answer. Under the circumstances here, such a motion is governed by Rule 15 of the Federal Rules of Civil Procedure, which provides in pertinent part that a party may amend "only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice requires." Fed.R.Civ.Proc. 15(a). Rule 15 further provides that

[u]pon motion of a party the court may, upon reasonable notice and upon such terms as are just, permit the party to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented.

Fed.R.Civ.Pro. 15(d). Here, defendants in fact seek merely to supplement their answer, in the sense that the additions they wish to make to their pleading are based on events that have occurred since the date of their initial answer. *See United States v. Int'l Business Machines Corp.*, 66 F.R.D. 223, 227–28 (S.D.N.Y.1975). Specifically, defendants would supplement their answer by attaching Arbitrator Ross's opinion denying plaintiff Clarke's grievance against his discharge in 1999

(which occurred after their initial pleading in response to the filing of the complaint), setting forth several averments relating to the proceedings in that case, and interposing an affirmative defense, lack of subject matter jurisdiction. The newly interposed affirmative defense, in turn, is argued in their papers on the basis of judicial opinions that were not available when the original answer was filed. (Defs.Mem. of Law at 1–3.) Thus, defendants seek to supplement their pleading because arbitral and judicial opinions of direct relevance to the allegations advanced in the complaint have issued since they answered in the first instance. It should go without saying that the granting of such an application is in the interests of justice, does not operate in any way unduly to prejudice plaintiffs, is not sought in bad faith, and, in any event, falls directly within the scope of Rule 15(d), as quoted just above. Accordingly, defendants' motion to amend and supplement their answer is granted.

■■■ Second, defendants have moved to dismiss plaintiffs' Title VII claims against the individual defendant, Thomas Lewis. The law of this Circuit is unmistakable and definitive: "individual defendants with supervisory control over a plaintiff may not be held personally liable under Title VII." *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1313 (2d Cir.1995). Plaintiffs do not contest the point, and citing their counsel's error, join in the defendants' motion to dismiss all purported Title VII claims against Thomas Lewis. The joint motion is hereby granted.[5]

■■■ Third, defendants have moved to dismiss plaintiffs' state law cause of action against UFI and Lewis for intentional infliction of emotional distress. In New York, a claim for intentional infliction of emotional distress claim must allege four elements: (1) extreme and outrageous conduct; (2) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the outrageous conduct and injury; and (4) severe emotional distress. *See Howell v. New York Post Co.,* 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 353, 612 N.E.2d 699 (1993); *Kurschus v. Paine-Webber, Inc.,* 16 F.Supp.2d 386, 394–95 (S.D.N.Y.1998). A heavy burden faces the plaintiff attempting to satisfy the first element of this test. *See Murphy v. American Home Products Corp.,* 58 N.Y.2d 293, 303, 461 N.Y.S.2d 232, 236, 448 N.E.2d 86 (1983) ("Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.") (internal quotation marks omitted). "[T]he requirements of the rule are rigorous, and difficult to satisfy." *Howell,* 81 N.Y.2d at 122, 596 N.Y.S.2d at 356, 612 N.E.2d 699 (internal quotation marks and citations omitted).

■■■ Even taking all of the plaintiffs' allegations as true, those allegations fall well short of the substantial threshold required as a matter of law to show outrageous conduct. Moreover, even on their own account (leaving aside the conclusory

---

5. Defendants have moved for sanctions against plaintiffs' counsel for the advancement of the Title VII claim against Lewis, pursuant to Rule 11 of the Federal Rules of Civil Procedure and 28 U.S.C. § 1927, contending that counsel should bear a portion of defense costs in connection with this motion. Section 1927 is not applicable in light of the requirement that sanctions under that provision must be sustained by a showing of bad faith. *See Eisemann v. Greene,* 204 F.3d 393, 396 (2d Cir.2000). Plaintiffs' counsel here has stated that the claim against Lewis was brought inadvertently and would have been withdrawn earlier had his attention been drawn to the matter, and that representation will be accepted as made by an officer of the Court. Rule 11 is also inappropriate, because of the failure of defense counsel to invoke the safe harbor provision of the Rule, requiring an application for sanctions under the Rule to be made by *separate motion according the* adverse party 21 days to withdraw or correct the action complained of. *See* Fed.R.Civ.Pro. 11(c)(1)(A).

boilerplate of the complaint), plaintiffs suffered nothing worse than occasional embarrassment and anger—again, something far short of the "severe distress" required under the law. Accordingly, the state claim for intentional infliction of emotional distress is dismissed for failure to state a claim. *See Stuto v. Fleishman,* 164 F.3d 820, 827–29 (2d Cir.1999) (sustaining 12(b)(6) dismissal of claim for intentional infliction of emotional distress and collecting cases).

## II. *Plaintiffs' Claims Under Title VII and the HRL*

There remain plaintiffs' Title VII claims of sexual harassment against UFI, and their analogous New York State Human Rights Law claims against both UFI and Lewis individually.

### A. *Applicable Supreme Court Precedents*

In 1974, the United States Supreme Court held "that there can be no prospective waiver of an employee's rights under Title VII." *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 51, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). *Gardner–Denver* involved an employee and union member whose claim of racially discriminatory discharge had been submitted to arbitration in accord with the provisions of a collective bargaining agreement, where it had been found without merit, and whose subsequent Title VII action was dismissed on the ground that the employee was bound by the prior arbitral decision. *Id.* at 43, 45–46, 94 S.Ct. 1011. Citing "congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable state and federal statutes," the Court decided that "an individual does not forfeit his private cause of action if he first pursues his grievance to final arbitration under the nondiscrimina-

tion clause of a collective-bargaining agreement." *Id.* at 48–49, 94 S.Ct. 1011.

The *Gardner–Denver* Court also looked to the limited function of the arbitrator under a collective bargaining agreement:

> As the proctor of the bargain, the arbitrator's task is to effectuate the intent of the parties. His source of authority is the collective-bargaining agreement, and he must interpret and apply that agreement in accordance with the 'industrial common law of the shop' and the various needs and desires of the parties. The arbitrator however, has no general authority to invoke public laws that conflict with the bargain between the parties: '[A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice....' Thus, the arbitrator has authority to resolve only questions of contractual rights, and this authority remains regardless of whether certain contractual rights are similar to, or duplicative of, the substantive rights secured by Title VII.

*Id.* at 53–54, 94 S.Ct. 1011 (quoting *United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 597, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)). Finally, the Court noted the "informality of arbitral procedure." *Gardner–Denver,* 415 U.S. at 58, 94 S.Ct. 1011. Observing that (i) "the factfinding process in arbitration usually is not equivalent to judicial factfinding"; (ii) "[t]he record of the arbitration proceedings is not complete," (iii) "the usual rules of evidence do not apply," and (iv) "rights and procedures common to civil trials, such as discovery, compulsory process, cross-examination, and testimony under oath, are often severely limited or unavailable," the Court concluded that arbitration is "a less appropriate forum for final resolution of Title VII issues than the federal courts." *Id.* at 57–58, 94 S.Ct. 1011.[6]

---

**6.** It is worth noting that, while directing the district court below to "consider the employee's claim *de novo,*" the Court added that

"[t]he arbitral decision may be admitted as evidence and accorded such weight as the court deems appropriate." *Gardner–Denver,*

In 1991, the Court revisited the question of whether Title VII claims are prospectively waivable. In *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), the Court held that an arbitration agreement that an individual had signed "[a]s a condition of his employment," *id.* at 23, 111 S.Ct. 1647, in which he had pledged to submit to arbitration any dispute that might.arise out of his employment or the termination thereof, was enforceable under the Federal Arbitration Act (FAA), 9 U.S.C. § 1 *et seq.*[7] The case involved a claim under the Age Discrimination in Employment Act (ADEA), 81 Stat. 602, as amended, 29 U.S.C. § 621 *et seq.* The defendant employer had moved to compel arbitration of the ADEA claim, pursuant to provision in the plaintiff's contract of employment, binding him to arbitration of disputes "arising out of the employment or termination of employment." *Id.* The district court had denied the motion, relying on *Gardner–Denver.* The Court of Appeals for the Fourth Circuit had reversed, finding nothing in the text of the ADEA precluding the enforcement of arbitration agreements.

The Supreme Court affirmed, in a decision that signaled a significant reassessment of several of at least two of *Gardner–Denver*'s grounds. First, the *Gilmer* Court rejected any challenge to arbitrability based on the adequacy of arbitration procedures, stating that "[s]uch generalized attacks on arbitration 'res[t] on suspicion of arbitration as a method of weakening the protections afforded in the substantive law to would-be complainants,' and as such, they are 'far out of step with our current strong endorsement of the federal statutes favoring this method of resolving disputes.'" *Gilmer,* 500 U.S. at 30, 111 S.Ct. 1647 (quoting *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 481, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989)). And second, the Court noted that, in the interim between *Gardner–Denver* and *Gilmer,* it had become "clear that statutory claims may be the subject of an arbitration agreement, enforceable pursuant to the FAA." *Gilmer,* 500 U.S. at 26, 111 S.Ct. 1647.

Nevertheless, the *Gilmer* Court distinguished *Gardner–Denver* for several reasons:

[f]irst, those cases [namely, *Gardner–Denver* and its progeny] did not involve the issue of the enforceability of an agreement to arbitrate statutory claims. Rather, they involved the quite different issue whether arbitration of contract-based claims precluded subsequent judicial resolution of statutory claims. Since the employees there had not agreed to arbitrate their statutory claims, and the labor arbitrators were

415 U.S. at 60, 94 S.Ct. 1011. Expanding on this last thought in a footnote, the Court declined to adopt standards "as to the weight to be accorded an arbitral decision," but cited as "relevant factors" the "existence of provisions in the collective-bargaining agreement that conform substantially with Title VII, the degree of procedural fairness in the arbitral forum, adequacy of the record with respect to the issue of discrimination, and the special competence of particular arbitrators." *Id.* at n. 21, 94 S.Ct. 1011. The Court concluded that "[w]here an arbitral determination gives full consideration to an employee's Title VII rights, a court may properly accord it great weight. This is especially true where the issue is solely one of fact, specifically addressed by the parties and decided by· the arbitrator on the basis of an adequate record. But courts should ever be mindful that Congress, in enacting Title VII, thought it necessary to provide a judicial forum for the ultimate resolution of discriminatory employment claims. It is the duty of courts to assure the full availability of this forum." *Id.*

7. The petitioner-plaintiff Gilmer was required as a condition of his employment to register with the New York Stock Exchange as a securities representative. His application to register with the NYSE contained an arbitration clause providing that Gilmer "agree[d] to arbitrate any dispute, claim or controversy" arising between him and his employer, the defendant-respondent in the case, and this clause was the basis of the employer's motion in the district court to compel arbitration. *Gilmer,* 500 U.S. at 35, 111 S.Ct. 1647.

not authorized to resolve such claims, the arbitration in those cases understandably was held not to preclude subsequent statutory actions. Second, because the arbitration in those cases occurred in the context of a collective-bargaining agreement, the claimants there were represented by their unions in the arbitration proceedings. An important concern therefore was the tension between collective representation and individual statutory rights, a concern not applicable to the present case. Finally, those cases were not decided under the FAA, which ... reflects a liberal federal policy favoring arbitration agreements....

*Id.* at 35, 111 S.Ct. 1647 (citations and internal quotation marks omitted).

The Court has recently taken up the arbitrability of statutory claims once more, in a case that squarely puts, and in this Court's view, answers, the question that is dispositive for this case. *Wright v. Universal Maritime Service Corp.*, 525 U.S. 70, 119 S.Ct. 391, 142 L.Ed.2d 361 (1998) involved a longshoreman covered by a collective bargaining agreement, who had bypassed arbitration of his discrimination claim in favor of federal litigation arising under the Americans with Disabilities Act (ADA), 104 Stat. 327, 42 U.S.C. § 12101 *et seq.* The collective bargaining agreement in *Wright* contained a clause submitting "[a]ny dispute concerning or arising out of the terms and/or conditions of this Agreement, or dispute involving the interpretation or application of this Agreement" to a process of arbitration. *Wright*, 525 U.S. at 73, 119 S.Ct. 391. But the agreement in *Wright* contained no language clearly indicating that statutory claims of discrimination might fairly be considered among its "terms and/or conditions." [8]

The Court held that the agreement before it "does not contain a clear and unmistakable waiver of the covered employees' rights to a judicial forum for federal claims of employment discrimination," but pointedly did not reach the question "whether such a waiver would be enforceable." *Id.* at 82, 119 S.Ct. 391.

There are two passages in *Wright* that suggest guidelines for determining whether a given collective bargaining agreement may fairly be read as a "waiver" of the right to bring a Title VII action *de novo* after having submitted the underlying discrimination claim to arbitration pursuant to provisions of the agreement. First, the Court suggests that "ordinary textual analysis" of the agreement may "show that matters which go beyond the interpretation and application of contract terms are subject to arbitration...." *Id.* at 79, 119 S.Ct. 391. Second, the *Wright* Court makes clear that it does not regard union-negotiated compulsory arbitration of employment discrimination claims to be objectionable as a matter of law or principle:

[W]e will not infer from a general contractual provision that the parties intended to waive a statutorily protected right unless the undertaking is explicitly stated. More succinctly, the waiver must be clear and unmistakable..... We think the same standard applicable to a union-negotiated waiver of employees' statutory right to a judicial forum for claims of employment discrimination. Although that is not a substantive right, *see Gilmer*, 500 U.S. at 26, 111 S.Ct. 1647, and whether or not *Gardner–Denver*'s seemingly absolute prohibition of union waiver of employees' federal forum survives *Gilmer*, *Gardner–Denver* at least stands for the proposition that the right to a federal judicial forum is of sufficient importance to be protected

---

8. The Court observed of the arbitration clause at issue: "[I]t is very general, providing for arbitration of '[m]atters under dispute,' App. 43a—which could be understood to mean matters in dispute under the contract. And the remainder of the contract contains ·no

explicit incorporation of statutory antidiscrimination requirements. (Indeed, it does not even contain, as did the CBA [in] ... *Gardner–Denver*, its own specific antidiscrimination provision.)" *Wright*, 525 U.S. at 80, 119 S.Ct. 391.

against less-than-explicit union waiver in a CBA.

*Id.* at 80, 119 S.Ct. 391 (citations and internal quotation marks omitted).

### B. *The CBA in this Case*

Turning to the CBA in this case, it is difficult to resist the conclusion that it presents precisely the sort of "clear and unmistakable waiver" contemplated in *Wright, id.* at 80, 81, 119 S.Ct. 391, at least as concerns Title VII claims of sexual harassment. Indeed, the CBA's language concerning such claims could not be clearer or more unmistakable. Section 36 of the CBA, entitled "Sexual Harassment," begins with a statement of the parties mutual commitment to ending sexual harassment in the workplace. It then offers a comprehensive definition of sexual harassment, using language drawn at least in part from the Supreme Court's descriptions of actionable conduct. *See, e.g., Faragher v. City of Boca Raton,* 524 U.S. 775, 780, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (stating that plaintiff-petitioner had been subjected to "uninvited and offensive touching, . . . lewd remarks, [and] speaking about women in offensive terms"); *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 747, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (describing the "repeated boorish and offensive remarks and gestures" that plaintiff endured from her supervisor at defendant employer). Section 36 then continues with the language crucial for the issue presented here:

> Grievances under this clause will be handled with all possible speed and confidentiality. In settling the grievance, disciplinary action may be taken against employees (both bargaining unit and non-bargaining unit) and supervisors who engage in any activity prohibited under this clause.

CBA at § 36. The clear and unmistakable implications of these clauses are two-fold. First, claims by covered employees that they have been sexually harassed shall be handled as "grievances." Second, as read in conjunction with the provisions of sections 33–35 of the CBA, set forth above, the term "grievances" refers to arbitration, and decisions issuing from arbitration "shall be final, conclusive and binding upon all the parties hereto, their heirs, executors, administrators, assigns, or successors in interest and upon any Employer and employee covered by this Agreement." *Id.* at § 35(D). Thus, in the light of "ordinary textual analysis," the CBA makes "clear and unmistakable" that claims by covered employees of sexual harassment shall be subject to the grievance procedure culminating in binding arbitration as provided for in ¶ 35, *supra. Wright,* 525 U.S. at 79, 80–81, 119 S.Ct. 391.

### C. *Whether the Plaintiffs Here Prospectively Waived their Title VII Claims Under the CBA*

The only question remaining is whether this provision is enforceable against these plaintiffs. Of course, this is precisely the question reserved by the Court in *Wright,* even as it hinted in dicta that, were it presented with a CBA containing clearer and more express language, it might well approve the waiver of statutory claims in such a context. In resolving the question here against the plaintiffs, this Court does not presume to extend the law. Rather, following the guidelines set forth in *Wright,* it analyzes a CBA and arrives at a conclusion that seems a fair application of those guidelines to very different facts.

Other courts have reached the same conclusion in similar circumstances. In *Almonte v. Coca–Cola Bottling Co. of New York, Inc.,* 959 F.Supp. 569 (D.Conn.1997), the plaintiff, a union member covered by CBA, was alleging violation of his rights under 42 U.S.C. § 1981, having declined to submit his claim to arbitration. Chief Judge Dorsey, ruling without benefit of the Court's guidance in *Wright,* found the statutory claim to be arbitrable pursuant to a clause in the CBA providing that "[i]n respect to [all] . . . conditions of employment, neither the Employer, nor the Union, will discriminate against any employee

because of race, ... [or] color ... as defined under Connecticut State Law and Federal Laws...." *Almonte,* 959 F.Supp. at 574 n. 2. Reasoning from the intersections between the *Gardner–Denver* and *Gilmer* lines of case law, Judge Dorsey stated the district courts should seek a "more reasonable accommodation of the conflict between vitiating individual statutory rights and enforcing the express terms of a fairly negotiated contract than a per se rule barring enforcement of CBA mandated arbitration of individual statutory claims." *Id.* at 574. Analyzing the CBA before him in light of that more accommodating standard, Judge Dorsey concluded that the plaintiff's § 1981 claims must be submitted to arbitration as mandated by the CBA. *Id. But see Air Line Pilots Ass'n Int'l v. Northwest Airlines, Inc.,* 199 F.3d 477, 484 (D.C.Cir.1999) (holding that even after *Gilmer,* and notwithstanding *Wright,* "*Gardner–Denver* stands as a firewall between individual statutory rights the Congress intended can be bargained away by the union ... and those that remain exclusively within the individual's control. Absent congressional intent to the contrary, a union may not use the employees' individual statutory right to a judicial forum as a bargaining chip to be exchanged for some benefit to the group; the statutory right 'can form no part of the collective bargaining process.' ") (citation omitted, quoting *Gardner–Denver,* 415 U.S. at 51, 94 S.Ct. 1011); *Beason v. United Technologies Corp.,* 37 F.Supp.2d 127, 132 (D.Conn.1999) (holding that *Wright* "established a presumption of arbitrability in the context of collective bargaining agreement waivers of employees' judicial forum rights," and observing that " 'harmony of interest between the union and the individual employee cannot always be presumed, especially where a claim of ... discrimination is made' ") (quoting *Gardner–Denver,* 415 U.S. at 58, 94 S.Ct. 1011).

Like the Court in *Almonte,* this Court is persuaded that out of the intersection between *Gardner–Denver* and *Gilmer,* as framed by *Wright,* a new protocol exists for the analysis of whether Title VII claims are subject to binding arbitration as provided for under collective bargaining agreements. Four considerations support this finding. First, *Gilmer* itself distinguished the rule of *Gardner–Denver* by noting that two crucial issues in that case had been whether the CBA-covered employees there had "agreed to arbitrate their statutory claims," and whether the labor arbitrator was "authorized to resolve such claims." *Gilmer,* 500 U.S. at 35, 111 S.Ct. 1647. In *Gardner–Denver,* the Court had answered both questions in the negative. Here, applying the "ordinary textual analysis" counseled by *Wright,* it is. clear that the Union did agree to arbitrate statutory claims premised on theories of sexual harassment, and equally clear that the appointed arbitrator was authorized to resolve such claims.

Second, the *Gilmer* Court also expressed concern over "the tension between collective representation and individual statutory rights," *Gilmer,* 500 U.S. at 35, 111 S.Ct. 1647, which the *Gardner–Denver* Court had resolved so emphatically (at least as it pertains to Title VII claims) in favor of individual rights. As to this matter of jurisprudential principle, *Wright* compels the conclusion that the law has changed since *Gardner–Denver,* at least to the extent of recognizing that there are indeed situations in which "statutory claims may be the subject of an arbitration agreement, enforceable pursuant to the FAA." *Wright,* 525 U.S. at 76, 119 S.Ct. 391 (quoting *Gilmer,* 500 U.S. at 26, 111 S.Ct. 1647 (citation and internal quotation marks omitted)); *see also Desiderio v. Nat'l Ass'n of Securities Dealers, Inc.,* 191 F.3d 198, 204 (2d Cir.1999) (noting that "*Gilmer* states the general principle that arbitration agreements are enforceable with regard to statutory claims, 'unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue' ") (quoting *Gilmer,* 500 U.S. at 26, 111 S.Ct. 1647).

Third, it should be recalled that the holding in *Gardner–Denver* was premised in large part on a reading of the legislative history of Title VII, concluding that "Title VII's purpose and procedures strongly suggest that an individual does not forfeit his private cause of action if he first pursues his grievance to final arbitration under the nondiscrimination clause of a collective-bargaining agreement." *Gardner–Denver*, 415 U.S. at 49, 94 S.Ct. 1011. Since then (in fact, just five months after the Supreme Court decided *Gilmer*), Congress has enacted a package of amendments to Title VII entitled the Civil Rights Act of 1991. Pub.L. 102–166, 105 Stat. 1071 (1991). Section 118 of the 1991 Act provides that "where appropriate and to the extent authorized by law, the use of alternative dispute resolution, including . . . arbitration, is encouraged to resolve disputes arising under [Title VII]." 105 Stat at 1081, reprinted in notes to 42 U.S.C. § 1981. *See Desiderio*, 191 F.3d at 203, 205 (finding that the phrase "to the extent authorized by law" in section 118 implicitly includes both *Gilmer* and the FAA, and concluding that "the underlying purposes of Title VII and the 1991 Civil Rights Act [do not] inherently conflict with the imposition of compulsory arbitration"); *Bercovitch v. Baldwin School, Inc.*, 133 F.3d 141, 150 (1st Cir.1998) ("[W]e do not find any 'inherent conflict' between mandatory arbitration of [claims alleging discrimination based on disability in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*] and the policies behind the ADA."); *Miller v. Public Storage Management, Inc.*, 121 F.3d 215, 218 (5th Cir.1997) (rejecting argument that the legislative history of the ADA takes that statute out of the FAA's arbitration requirements); *Austin v. Owens–Brockway Glass Container, Inc.*, 78 F.3d 875, 881 (4th Cir.1996), *cert. denied*, 519 U.S. 980, 117 S.Ct. 432, 136 L.Ed.2d 330 (1996) (surveying section 118 and the other legislative history of the 1991 Act and concluding that its language "could not be any more clear in showing Congressional favor towards

arbitration"); *but see Duffield v. Robertson Stephens & Co.*, 144 F.3d 1182, 1198 (9th Cir.1998) (holding that a compulsory arbitration clause identical to the one analyzed in *Gilmer* is unenforceable with respect to Title VII claims, and concluding of § 118 that it was intended by Congress "to codify the *Gardner–Denver* approach to compulsory arbitration agreements with respect to Title VII claims").

Finally, the holding in *Gardner–Denver* was premised in part on concerns that are simply not applicable here, for reasons pertaining particularly to the facts of the case. The *Gardner–Denver* Court worried that "[a]rbitral procedures, while well suited to the resolution of contractual disputes, make arbitration a comparatively inappropriate forum for the final resolution of rights created by Title VII." 415 U.S. at 56, 94 S.Ct. 1011. The Court cited three reasons sustaining this conclusion. First, "the special role of the arbitrator, whose task is to effectuate the intent of the parties rather than the requirements of enacted legislation," dictates that "[w]here the collective-bargaining agreement conflicts with Title VII, the arbitrator must follow the agreement." *Id.* at 56–57, 94 S.Ct. 1011. But here, under the CBA there can be no conflict between the intent of the parties and the statutory mandate of Title VII, because the CBA specifically incorporates the statutory prohibition on sexual harassment (that is, as it has evolved in the case law interpreting Title VII's express ban on sexual discrimination), and specifically charges the arbitrator with resolving disputes over whether that law has been breached.

The *Gardner–Denver* Court also invokes the distinction between the "law of the shop" and the "law of the land," arguing that the competence of arbitrators extends to the former, but not necessarily to the latter. *Id.* at 57, 94 S.Ct. 1011. But again, that concern is surely mitigated here, where the applicable law of the shop simply is the law of the land. Moreover, the adjudication of the dispute here,

whether considered as arising under the law of the shop or the law of the land, is almost entirely a matter of factfinding. There is no question on this record that the factfinding was thorough, conscientious, and undertaken at every step in accord with the plaintiffs' rights to procedural due process.

This last thought touches directly on the third of the *Gardner–Denver* Court's specific concerns about arbitral procedures in the context of Title VII disputes. The Court says:

> the factfinding process in arbitration usually is not equivalent to judicial factfinding. The record of the arbitration proceedings is not as complete; the usual rules of evidence do not apply; and rights and procedures common to civil trials such as discovery, compulsory process, cross-examination, and testimony under oath, are often severely limited or unavailable.... Indeed, it is the informality of arbitral procedure that enables it to function as an efficient, inexpensive, and expeditious means for dispute resolution. This same characteristic, however, makes arbitration a less appropriate forum for final resolution of Title VII issues than the federal courts.

*Id.* at 57–58, 94 S.Ct. 1011 (citations omitted). Of course, none of these procedural lacunae are present here—a fact that, strikingly, the plaintiffs do not contest, in declining to raise an issue about the fairness or adequacy of the arbitral proceedings as such. Thus, the record of the proceedings had before Arbitrator Ross is quite complete. Rules of evidence appear to have applied, in the sense that objections were made and ruled on in the course of testimony, which was given under oath, and subject to cross-examination. All parties had broad rights of discovery and compulsory process, pursuant to a provision of the CBA. *See* CBA § 35(C). It is true that the arbitral proceedings here were expeditious, and perhaps even "informal," as compared with the typical course of litigation in federal district court. But

those considerations by themselves hardly serve to impugn the reliability of the result.

The foregoing suggests that, even under the standards and concerns set forth in *Gardner–Denver*, the arbitral process here would pass muster for the purpose of deciding whether a prior arbitral determination of claims arising under Title VII is enforceable against the plaintiffs in a subsequent judicial proceeding. This question deserves closer examination, however, which now follows.

D. *The Collateral Estoppel Effect of the Prior Arbitral Decision Here*

■ Although the defendant has not moved to confirm, or the plaintiffs to vacate, the arbitration award denying plaintiffs' sexual harassment grievances, such a motion is not a necessary prerequisite to judicial action giving effect to such an award. Thus, the Second Circuit has held that an arbitration award has issue preclusive effect, even in the absence of judicial confirmation of the award. *See Benjamin v. Traffic Exec. Ass'n Eastern Railroads*, 869 F.2d 107, 111–13 (2d Cir.1989).

The Second Circuit has also held that adverse arbitration findings do not collaterally estop a discharged employee's claim brought under 42 U.S.C. § 1983. *See Coppinger v. Metro–North Commuter R.R.*, 861 F.2d 33 (2d Cir.1988). But the Court's distinction of *Coppinger* in *Benjamin* makes it apparent that the appropriate course here is to proceed as in *Benjamin*, and to give Arbitrator Ross's decision preclusive effect on all factual issues raised by plaintiffs' complaint, and on that basis, to grant summary judgment to the defendants.

First, the *Benjamin* Court emphasized the difference between claim and issue preclusion:

> Courts will apply collateral estoppel and not res judicata because the values of avoiding embarrassing inconsistencies and avoiding burdening a court and an

adversary with repetitious litigation are 'served more directly by issue preclusion than by claim preclusion.'

*Benjamin,* 869 F.2d at 112 (quoting 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4416, at 139 (1981)). The same consideration certainly applies here, where the plaintiffs have already had the benefit of plenary proceedings in which to air and develop their claims.

Second, the *Benjamin* Court noted that the issue presented in the prior arbitration proceedings in *Coppinger* —whether the plaintiff had been improperly discharged under the provisions of his contract of employment—were different from the salient issue raised in his suit under § 1983—namely, whether his Fourth Amendment rights had been violated. But again, here the issues with respect to which Arbitrator Ross's award is preclusive are all factual ones. *Benjamin,* 869 F.2d at 112. Once the preclusive effect of that award is recognized, the factual issues raised by plaintiffs' complaint evaporate, and summary judgment becomes appropriate.

Third, the *Coppinger* Court "questioned the competence of arbitrators to determine legal and factual issues raised under the fourth amendment and under § 1983." *Benjamin,* 869 F.2d at 112. By contrast, there is no question that arbitrators are competent, at least in principle, to determine legal and factual issues relating to the kind of federal statutory claims raised here. *See Gilmer,* 500 U.S. at 26, 111 S.Ct. 1647 (surveying the range of "enforceable arbitration agreements relating to claims arising under the Sherman Act ... the Securities Exchange Act ... RICO ... [and, of course, *per Gilmer,* the ADEA]").

Finally, the *Coppinger* Court expressed misgivings about the procedures applied in the arbitral proceedings below. *Coppinger,* 861 F.2d at 38–39. By contrast, as has already been observed, there is no question on the record concerning not just the adequacy, but the fairness of the arbitral procedures under which plaintiffs' grievances were adjudicated. Hearings were held over the course of five days, and testimony was taken from 10 witnesses, including both plaintiffs and the individual defendant. That testimony was given under oath, and was subject to cross-examination, and a full transcript was taken, part of which was submitted on this motion. All parties were represented by counsel. Objections were permitted and ruled on, and post-hearing briefs were submitted by both sides. Finally, Arbitrator Ross issued a meticulous, well-reasoned, and finally persuasive opinion ruling on all of the factual issues raised by the plaintiffs on their claims of sexual harassment. The inescapable impression is of an arbitral process that was procedurally fair, and more than adequate in its development of the issues surrounding the discrimination claims. *See Gardner–Denver,* 415 U.S. at 60 n. 21, 94 S.Ct. 1011 ("Where an arbitral determination gives full consideration to an employee's Title VII rights, a court may properly accord it great weight. This is especially true where the issue is solely one of fact, specifically addressed by the parties and decided by the arbitrator on the basis of an adequate record.").

■ It follows that under the law of this Circuit, it is proper to accord issue preclusive effect to the findings of Arbitrator Ross's opinion denying plaintiffs' grievances based on allegations of sexual harassment. This in turn has the effect of resolving all factual issues raised by plaintiffs' complaint against them, so compelling summary judgment in favor of defendants on all of plaintiffs' Title VII claims, and for analytically identical reasons, on their New York HRL claims as well. *See Tomka v. Seiler Corp.,* 66 F.3d at 1304, 1312–13 (setting forth the summary judgment standard with respect to Title VII sexual harassment claims, and holding that Title VII and HRL claims may be decided under the same analytical standards). Accordingly, the defendants' motion for summary judg-

ment is granted, dismissing plaintiffs' remaining claims in their entirety.

## CONCLUSION

For the reasons set forth above, the defendants' motion to supplement their pleading is granted, their motion to dismiss the plaintiffs' claim of intentional infliction of emotional distress is also granted, and their motion for summary judgment on all of plaintiffs' remaining claims is granted in its entirety, and the complaint is dismissed.

SO ORDERED.