**Steve MIDDLETON, Plaintiff,**

v.

**BALL–FOSTER GLASS CONTAINER CO., L.L.C., Defendant.**

**No. Civ.A. 3:99–CV–0964–P.**

United States District Court,
N.D. Texas,
Dallas Division.

Feb. 2, 2001.

John E. Wall, Jr., Laura Ellen Calhoun, Law Office of John E. Wall, Jr., Dallas, TX, for plaintiff.

Robin S. Ghio, Jenkens & Gilchrist, Dallas, TX, Richard Matthew Kobdish, Jr., Fulbright & Jaworski, Dallas, TX, for Ball-Foster Glass Container Co., LLC, defendant.

Courtenay Lee Bass, Dallas, TX, pro se.

## MEMORANDUM OPINION AND ORDER

SOLIS, District Judge.

Now before the Court are Defendant's Rule 56 Motion for Summary Judgment and Rule 12(b)(1) Motion to Dismiss, Plaintiff's Response to Defendant's Motion to Dismiss and for Summary Judgment, and Defendant's Reply to Plaintiff's Response to Defendant's Rule 56 Motion for Summary Judgment and Rule 12(b)(1) Motion to Dismiss. The Court has considered Defendant's present motion and, for the reasons discussed herein, hereby DENIES Defendant's Motion to Dismiss and GRANTS Defendant's Motion for Summary Judgment.

## BACKGROUND

Plaintiffs' Complaint alleges that Defendant violated the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA"), by failing to reasonably accommodate him, unlawfully "refus[ing] to permit Plaintiff to return to work on or after March 27, 1998 although released by his doctor, and retaliation". Plaintiff also alleges a violation of Texas Labor Code § 451.001 for discrimination against Plaintiff because he filed a worker's compensation claim in good faith.

Plaintiff is represented by the Glass, Molders, Pottery Plastics & Allied Workers Union, AFL–CIO, CLC ("the Union"). On October 16, 1998, the Union filed a grievance on Middleton's behalf, alleging contractual violations.[1] Pursuant to the grievance under the National Labor Relations Act, 29 U.S.C. §§ 151, *et seq.* ("NLRA"), an arbitration was held before a mutually selected neutral. On July 11, 2000 the arbitrator issued his Award denying the grievance.[2]

## FACTS

Ball–Foster's Waxahachie plant manufactures glass bottles. Prior to his injury, Plaintiff was employed as a floor person/apprentice operator in the part of the plant where molten glass is formed by machines into bottles, known as the "hot end;" the "cold end" is the part of the plant where the bottles are inspected, put into boxes, stored in a warehouse, etc.[3] Prior to becoming a floor person/apprentice operator, Plaintiff worked at various jobs in the cold end.[4]

On May 30, 1996, Plaintiff suffered a back injury on the job, and later took an extended medical leave of absence for surgery and recovery/rehabilitation.[5] In August of 1996, Middleton was seen by two company doctors: Dr. Bousquet, and Dr. Garrison of Baylorworx (a medical clinic where Defendant sends employees to treat on the job injuries), for an evaluation of his back injury.[6] Dr. Garrison evidently declined to give Plaintiff an MRI, thinking it an unnecessary expense, and released Plaintiff to work with no restrictions on September 3, 1996.[7] Plaintiff provided his release to Defendant and resumed working. On September 7, Plaintiff went to the emergency room to treat his back pain; he was then referred to Dr. Bousquet for an MRI.[8] Dr. Bousquet removed Plaintiff from work, an MRI was performed, and Middleton underwent back surgery to treat a herniated disk.[9] In September

---

1. Def's App. at 11.

2. Def's App. at 59.

3. Def's App. at 16–18, 20–23.

4. Def's App. at 16–18, 20–23.

5. Def's App. at 60–64.

6. Pl's App. at 2, 28.

7. Pl's App. at 2.

8. Pl's App. at 2.

9. Pl's App. at 2–3.

1996, Plaintiff filed an Employee's Notice of Injury and Claim for Compensation with the Texas Worker's Compensation Commission (TWCC) and began receiving benefits.[10] In October 1997, Middleton had a Functional Capacity Evaluation (FCE) performed at Baylorworx at Dr. Bousquet's recommendation.[11]

Plaintiff was released to work with no restrictions by Dr. Bousquet, and returned to work on January 5, 1998 in his floor person/apprentice operator position, an absence of 15 months.[12] The next day, Plaintiff's supervisor evidently singled out Middleton for a verbal warning for his performance, and placed him on a machine he was unfamiliar with; a writeup for poor performance followed.[13]

Plaintiff experienced pain and back swelling, and on March 2, 1998, Plaintiff changed his "treating doctor" upon approval from the TWCC to Charles Osborn, a local chiropractor.[14] Dr. Osborn's initial medical opinion was that Plaintiff had permanent work restrictions, meaning they lasted "forever."[15] Plaintiff Middleton understood that Doctor Osborn's restrictions were permanent, but that he might be able to do a cold end job.[16] Julia Kirchner, Defendant's Human Resources Manager, evidently also understood the restrictions to be permanent.[17] Dr. Osborn wrote an Employee's Work Limitation Slip for Mid-

dleton to give to Defendant, and recommended a "badge change," or permanent job reassignment.[18] Around March 27, 1998, Plaintiff was released to work permanent light duty.[19] Plaintiff was diagnosed with post-laminectomy syndrome and was restricted by his doctor from lifting over 25 pounds, excessive bending, and heavy pushing and pulling.[20] Plaintiff then attempted to return to work and presented his release to Human Resources Manager Julie Kirchner, who told Plaintiff to go home and that she would call him when they had a job for him.[21]

On April 15, 1998, Middleton filled out a "Statement of Claim For Continuance of Life Insurance Protection During Total Disability" through which Dr. Osborn indicated Plaintiff was totally disabled for his regular occupation, so that he could never return to work in his regular occupation.[22] However, a second employee work limitation slip of May 8, 1998 signed by Dr. Osborn indicated that Plaintiff's limitations were temporary for 8 weeks, with no badge change recommendation.[23] Kirchner found this change out of the ordinary.[24] At some point which is disputed, Plaintiff told Dr. Osborn that his application for permanent disability benefits had been denied (for lack of seniority, as Plaintiff recalls Kirchner's account).[25] Upon seeing the change from permanent to tem-

10. Pl's App. at 3.

11. Pl's App. at 3.

12. Pl's App. at 3; Def's App. at 85.

13. Pl's App. at 3–4.

14. Def's App. at 99; Pl's App. at 4.

15. Def s App. at 100, 152.

16. Def's App. at 86, 87, 30–31, 94–95.

17. Def's App. at 182–84.

18. Def's App. at 114, 134, 153–157.

19. Def's App. at 172 (Pl's Answers to Interrogatories).

20. Def's App. at 114.

21. Pl's App. at 4.

22. Def's App. at 175–76. *See also* Def's App. at 135–36, 160–62 (testimony of Osborn).

23. Def's App. at 196.

24. Def's App. at 186.

25. Def's App. at 32–33; Pl's App. at 5.

porary restriction, Kirchner remarked, "Oh, what an interesting coincidence," referring to her earlier explanation to Plaintiff that only those employees temporarily restricted receive light duty.[26] Two more limitation slips followed with similar temporary restrictions and limitations on Plaintiff's physical activities.[27]

On August 10, 1998, Kirchner wrote to Dr. Osborn expressing her understanding that Plaintiff could not return to his old job, and requesting Osborn to consider Plaintiff's fitness for several "cold-end" jobs.[28] Dr. Osborn's reply simply listed several cold-end jobs which he thought Plaintiff could do.[29] Kirchner wrote back to ask for more information, noted Defendant's desire for a second opinion from its own doctor, and requested Osborn to prescribe an FCE from Baylorworx.[30]

Around September 14, 1998, Middleton told Kirchner that he did not want Baylorworx to perform the FCE, but would prefer Sargent Injury Rehabilitation, and Kirchner agreed.[31] Plaintiff opposed using Baylorworx because of Dr. Garrison's less than thorough and accurate examination and diagnosis of Plaintiff's original injury; Plaintiff further understood that where an FCE is performed is inconsequential, but that Sargent's equipment was computerized, not manual like Baylorworx's.[32] Dr. Osborn was an employee of Sargent, though Kirchner was not aware of it when

she approved of Sargent.[33] When Kirchner received the Sargent FCE signed by Osborn and citing his opinions, she realized the FCE was not independent from the first opinion she sought to verify.[34] The FCE specifically approved Middleton's return to the cold end jobs previously listed by Dr. Osborn.[35] However, the FCE stated Middleton was restricted on a repetitive basis from most of the physical activities listed, including bending and reaching.[36] The meaning or application of these restrictions is not elaborated.[37] Kirchner wrote to Osborn to reconcile the apparent discrepancies, and Dr. Osborn took a tour of the plant before writing Kirchner that Plaintiff could return to the floor person/apprentice operator position, a hot end job, "provided he does not have to change out the cores or the molds himself," and also naming several suitable cold end jobs.[38] There is evidence that Kirchner had stated that if Osborn would tour the plant and note the jobs Middleton could perform, Middleton would be returned to work.[39]

Kirchner brought in Cathleen Moore of Baylorworx who conducted a job site assessment at the plant in February of 1999 and concluded that changing of the molds was an essential floor person/apprentice operator job function; Plaintiff has agreed.[40] In March 1999, Kirchner wrote Middleton to request a release of medical

---

**26.** Pl's App. at 21.

**27.** Def's App. at 198–99.

**28.** Def's App. at 200.

**29.** Def's App. at 215.

**30.** Def's App. at 216.

**31.** Def's App. at 188–89.

**32.** Pl's App. at 6.

**33.** Def's App. at 125–26, 138, 188–89.

**34.** Def's App. at 189–91, 218.

**35.** Def's App. at 218.

**36.** Def's App. at 220.

**37.** *Id.*

**38.** Def's App. at 191–92, 225–26.

**39.** Pl's App. at 58–61.

**40.** Def's App. at 227, 232, 92–93, 19.

information so a third party could compare the job analysis to Plaintiff's medical capabilities.[41] Plaintiff's attorney responded a month later by criticizing Defendant's delay in returning Plaintiff to work and the rejection of Dr. Osborn's recommendations, and threatened suit.[42] Defendant's response just twelve days later cited apparent inconsistencies in Dr. Osborn's statements and expressed the desire for a second opinion.[43]

In July 1999, Defendant wrote Middleton to inform him of a recall from layoff and invite him to take a cold end job if he would submit to an FCE by Company doctors who would determine if Middleton could work safely.[44] Plaintiff's response only criticized Defendant's conduct in contacting Mr. Middleton rather than his counsel; Defendant responded to the concern.[45]

On September 21, 1999, Middleton was informed by Todd Glawe, Defendant's new human resources manager, that he was being suspended for refusing to report to Baylorworx for evaluation.[46] Plaintiff responded by offering to submit to evaluation by a provider other than Baylorworx and noting Defendant's rights to a medical exam under the Federal Rules.[47] Defendant later sought simply to confirm Plaintiff's first FCE as well as to obtain the medical release.[48] Plaintiff claims that Middleton provided a medical records authorization in response to Defendant's Request for Production in this case.[49] Plaintiff's letter to Defendant claimed to have provided a release in August 1999, and

further stated that Kirchner had access to Middleton's release through Metropolitan Life Insurance Company since 1998, that Middleton had authorized release of his information at Baylorworx in 1996, and that Baylorworx as a designated expert could review Middleton's file.[50]

The Sargent FCE was eventually given to Baylorworx. Plaintiff received an offer to return to a cold end job and has worked there since August 2, 2000 primarily as a line attendant.[51]

## DISCUSSION

### A. SUMMARY JUDGMENT STANDARD

Summary Judgment shall be rendered when the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). All evidence and the reasonable inferences to be drawn therefrom must be viewed in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). The moving party bears the burden of informing the district court of the basis for its belief that there is an absence of a genuine issue for trial, and of identifying those portions of the record that demonstrate such an ab-

41. Def's App. at 234.

42. Def's App. at 236.

43. Def's App. at 238.

44. Def's App. at 248.

45. Def's App. at 249, 250.

46. Def's App. at 251; Pl's App. at 8.

47. Def's App. at 252–53. Pl's App, at 8.

48. Def's App. at 254.

49. Pl's App. at 9. The Court notes the lack of citation to documentary evidence of Plaintiff providing such a release.

50. Def's App. at 255–56.

51. Pl's App. at 9.

sence. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548.

Once the moving party has made an initial showing, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The party defending against the motion for summary judgment cannot defeat the motion unless he provides specific facts that show the case presents a genuine issue of material fact, such that a reasonable jury might return a verdict in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Mere assertions of a factual dispute unsupported by probative evidence will not prevent summary judgment. *Id.* at 248–50, 106 S.Ct. 2505; *Abbott v. Equity Group, Inc.*, 2 F.3d 613, 619 (5th Cir.1993). In other words, conclusory statements, speculation and unsubstantiated assertions will not suffice to defeat a motion for summary judgment. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir.1996) (en banc). If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case, and on which he bears the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548.

■ Finally, the Court has no duty to search the record for triable issues. *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 403 (6th Cir.1992). The Court need only rely on the portions of submitted documents to which the nonmoving party directs. *Id.*

## B. THE ARBITRATION CLAUSE

■ The Court must first consider Defendant's motion to dismiss under Fed. R.Civ.Proc. 12(b)(1). Defendant argues that Plaintiff's statutory ADA claim was waived by the arbitration provision of his collective bargaining agreement.

Defendant acknowledges the holding of the Supreme Court in *Alexander v. Gardner–Denver Co.* that an employee did not waive or otherwise forfeit his rights under Title VII when he arbitrated a contractual claim under his collective bargaining agreement that dealt with the same evidence as his Title VII statutory claim. 415 U.S. 36, 49–52, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). The Court found that an employee could not prospectively waive his rights under Title VII. *Id.* Defendant then cites *Gilmer v. Interstate*, which approved of arbitration generally, and held that a claim under the Age Discrimination in Employment Act was subject to compulsory arbitration pursuant to an agreement in a securities registration application (in conjunction with his employment). 500 U.S. 20, 35, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). The Court distinguished the issue in *Gardner–Denver* as whether an agreement precludes statutory claims merely by agreeing to arbitrate contractual ones; on the contrary, *Gilmer* dealt with an agreement to arbitrate statutory claims. 500 U.S. at 35, 111 S.Ct. 1647.

The Supreme Court recognized the tension between the two doctrines in *Wright v. Universal Maritime Ser. Corp.*, but dodged the issue of whether a union-negotiated waiver of a federal judicial forum for statutory claims of employment discrimination would be valid. 525 U.S. 70, 82, 119 S.Ct. 391, 142 L.Ed.2d 361 (1998). Instead, the Court found that the collective bargaining agreement ("CBA") in the case did not waive such rights: any such waiver must be "explicitly stated" and "clear and unmistakable." *Id.* at 80, 119 S.Ct. 391. The Court found it important that the CBA in question contained a general arbitration clause of "matters under dispute,"

incorporated a general intent that the contract not violate state or federal laws (rather than specifically incorporated certain statutes), and included a provision disclaiming anything not contained within the agreement as not part of the agreement. *Id.* at 80–81, 119 S.Ct. 391.

Because Defendant argues that the other Circuits are split on interpreting these issues of law, the Court will focus mostly on the law of this Circuit. The parties seem to agree the Fifth Circuit has not spoken specifically to the case at bar. The Fifth Circuit found generally that Title VII claims can be subjected to compulsory arbitration after *Gilmer*, though the case did not involve a union contract. *Alford v. Dean Witter Reynolds, Inc.*, 939 F.2d 229 (5th Cir.1991). *Maddox v. Runyon* found no waiver where arbitration was not required by a union contract. 139 F.3d 1017 (5th Cir.1998). Defendant calls upon the law of the Fourth Circuit to say that the "clear and unmistakable" requirement may be satisfied in two ways: an explicit arbitration clause by which the union submits all statutory employment discrimination claims to arbitration, or the presence of another provision like a nondiscrimination clause that makes it unmistakably clear that the discrimination statutes at issue are part of the agreement. *Brown v. ABF Freight Systems, Inc.*, 183 F.3d 319, 321 (4th Cir.1999). The case continued that the language that the contract "covers employees with a qualified disability under the Americans with Disabilities Act" in the context of the preceding sentence that outlined other forbidden criteria for discrimination indicates that the ADA was not specifically incorporated, and thus, no waiver. *Id.*

Defendant argues that the contract in this case fulfills the second prong of another provision like a nondiscrimination clause that makes it "unmistakably clear that the discrimination statutes at issue are part of the agreement." Defendant further cites the finding of the arbitrator that the ADA did not mandate Defendant to reasonably accommodate Plaintiff by having an assistant perform an essential part of Plaintiff's job which Plaintiff cannot perform himself (thus deciding an ADA claim).[52] Defendant argues that the specificity of the agreement is pivotal to whether the federal forum is waived. *Compare Jupiter v. Bellsouth Telecommunications, Inc.*, 1999 WL 1009829 (E.D.La.1999) (finding no bar where "the CBA does not make compliance with federal antidiscrimination statutes an obligation under the agreement") *with Clarke v. UFI, Inc.*, 98 F.Supp.2d 320, 332 (E.D.N.Y.2000) (finding agreement "clear and unmistakable" where agreement included comprehensive discussion of sexual harassment as well as a binding arbitration clause).

Plaintiff does not dispute Defendant's reading of the applicable law. However, Plaintiff argues that the union contract does not waive Defendant's rights to a federal forum. First, Plaintiff notes that the disputes under the contract "*may* be referred to arbitration" (emphasis added).[53] Plaintiff concludes that there is no mandatory arbitration, and no waiver of the right to file suit in federal court. Defendant counters that the distinction that the parties *may* arbitrate is irrelevant once the case is submitted to arbitration. The Court notes that the result of the arbitrator is made final and binding on the Company and the Union.[54]

The Court finds the *ABF Freight* case to encompass a situation most analogous to this case, and reaches the same conclusion

---

52. Def's App. at 57.

53. Def's App. at 6–7.

54. Def's App. at 7.

that there is no clear and unmistakable inclusion of the ADA in the union contract that would waive Plaintiff's right to a federal forum. The contract contains three relevant provisions. Article 31 generally states that "there shall be no discrimination against any employee because of race, color, creed, national origin, age, sex, *disability* or veteran status"[55] (emphasis added). Article 33 entitled "Disabled Employees," Section 2 grants a worker who was disabled by occupational injury and cannot perform his job the right to be placed on another appropriate job.[56] Article 33 Section 3 provides in part, "This Contract shall be administered in accordance with the applicable provisions of the Americans with Disabilities Act." Though it is a close question, the Court does not see a "clear and unmistakable" intent to waive Plaintiff's federal forum. Section 2's listing of other substantive rights suggests that Section 3 be read not as an incorporation of Plaintiff's claims under the ADA, but as a means to interpret Section 2. Accordingly, it would be appropriate to import the definition of "disabled" from the ADA (as invoked by Section 3) into Section 2 to define Plaintiff's rights thereunder.

Further, the Court does not believe that Plaintiff's claims under the ADA were actually litigated and decided by the arbitrator. The precise question the arbitrator considered was "Did the company violate the collective bargaining agreement by refusing to return the grievant, Steve Middleton, to employment, as and when it did, following his injury at work on May 30, 1996? . . . ."[57] The arbitrator made explicitly clear that Article 33, Section 2 "is the provision that Grievant alleges the Company has violated . . . .", not Section 3 encompassing the ADA reference.[58] The contract and the arbitration decision both

honor the distinction between the contractual and statutory claims that so consumed the *Gardner–Denver* court. Accordingly, Plaintiff has not waived his right to litigate his statutory claims in a federal forum.

## C. THE ADA

The ADA prohibits employers like Ball–Foster from discriminating against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, hiring, advancement, or discharge of employees. 42 U.S.C. § 12112(a); *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1092 (5th Cir. 1996). A "disability" includes "a physical or mental impairment that substantially limits one or more of the major life activities of such an individual; a record of such an impairment; or being regarded as having such an impairment." 42 U.S.C. § 12102(2)(A)–(C); *Turco*, 101 F.3d at 1092. Being regarded as having an impairment means that the plaintiff: "(1) [h]as a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation; (2)[h]as a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or (3)[h]as none of the impairments defined [in the regulations] but is treated by a covered entity as having a substantially limiting impairment." 29 C.F.R. § 1630.2(*l*)(1)–(3).

"A person is 'regarded as having' an impairment that substantially limits the person's major life activities when other people treat that person as having a substantially limiting impairment." *Wooten v. Farmland Foods*, 58 F.3d 382, 385–86 (8th

---

**55.** Def's App. at 9.

**56.** Def's App. at 10.

**57.** Def's App at 42 (Arbitrator's Decision).

**58.** Def's App. at 45.

Cir.1995); *McAlpin v. National Semiconductor Corp.*, 921 F.Supp. 1518, 1522 (N.D.Tex.1996). The focus is on the impairment's effect upon the attitude of others. *Wooten*, 58 F.3d. at 385–86. This provision is intended to combat the effects of "archaic attitudes," erroneous perceptions, and myths that work to the disadvantage of persons with or regarded as having disabilities. *Id.* The "regarded as" component of disability "is designed to protect against erroneous stereotypes some employers hold regarding certain physical or mental impairments that are not substantially limiting in fact." *Kocsis v. Multi–Care Management, Inc.*, 97 F.3d 876, 885 (6th Cir.1996). Under that provision, a "plaintiff must show that the perceived impairment is a substantial limitation on a major life activity." *Id.*

"Substantially limits ... means ... [u]nable to perform a major life activity that the average person in the general population can perform; or [s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. §§ 1630.2(j)(1)(i)–(ii); *Robinson v. Global Marine*, 101 F.3d 35, 36 (5th Cir.1996), *cert. denied*, 520 U.S. 1228, 117 S.Ct. 1820, 137 L.Ed.2d 1028 (1997). One whose impairment merely affects one or more major life activities is not disabled. *Barfield v. Bell South Telecommunications, Inc.*, 886 F.Supp. 1321, 1324 (S.D.Miss.1995).

"Major Life Activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i); *Robinson*, 101 F.3d at 36. Other major life activities could include lifting, reaching, sitting or standing, 29 C.F.R. § 1630, Appendix to Part 1630—Interpretive Guidance on Title I of the [ADA] § 1630.2(*l*); *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 726 (5th Cir.1995), The EEOC's Interpretive Guidelines proclaim that an individual's ability to perform the major life activity of working should only be considered if the individual is not substantially limited in any other major life activity. 29 C.F.R. Part 1630, Appendix § 1630.2(j); *Barfield*, 886 F.Supp. at 1324.

"With respect to the major life activity of working ... [t]he term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630 .2(j)(3)(i); *Ellison*, 85 F.3d at 190; *Maulding v. Sullivan*, 961 F.2d 694, 698 (8th Cir.1992), *cert. denied*, 507 U.S. 910, 113 S.Ct. 1255, 122 L.Ed.2d 653 (1993). "Working" under the ADA "does not mean working at a particular job of that person's choice." *Wooten* 58 F.3d at 385–86. Nor is an individual "substantially limited in working just because he or she is unable to perform a particular job for one employer...." *Foreman*, 113 F.3d at 1407.

## I. PLAINTIFF'S DISABILITY

The Supreme Court recently laid out a three-step process for evaluating whether someone has a disability: first, whether the condition is a "physical impairment," second, whether the life activity affected is a "major" one, and third, whether the impairment "substantially" limits the major life activity. *Bragdon v. Abbott*, 524 U.S. 624, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). As noted above, major life activities include caring for oneself, performing

manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. 29 C.F.R. § 1630.2(i); *Robinson*, 101 F.3d at 36. In addition, other major life activities could include lifting, reaching, sitting or standing. 29 C.F.R. § 1630, Appendix to Part 1630—Interpretive Guidance on Title I of the [ADA] § 1630.2(*l*); *Dutcher*, 53 F.3d at 726.

■ Plaintiff's brief cites the opinion of Dr. Richard Raughton that Plaintiff suffers from status post lumbar laminectomy pain with acute exacerbations.[59] Plaintiff's physical impairment is not disputed. In response to direct question from Plaintiff's attorney, Dr. Raughton agreed that Plaintiff has a physical impairment that substantially limits major life activity.[60] In order to evaluate this conclusory statement, this Court must investigate the consequences of Plaintiff's condition and the evidence supporting it. In his brief, Plaintiff cites to Dr. Raughton's deposition to conclude that Plaintiff suffers from a substantial impairment of "lifting, bending, pushing, pulling, walking, driving and jogging."[61] The work limitation slip signed by Dr. Osborne specifically recommends "no *excessive* bending, no heaving pushing or pulling."[62] The slip recommended no heavy lifting over 25 pounds.[63] The Court considers these contentions.

The lifting restrictions placed on Plaintiff limit his lifting at his job to 25 pounds.[64] In *Pryor v. Trane Co.*, the Fifth Circuit approved of the holding of a Fourth Circuit case that "as a matter of law, ... a twenty-five pound limitation ... does not constitute a significant restriction on one's ability to life, work, or perform any other major life activity." 138 F.3d 1024, 1027, *citing Williams v. Channel Master Satellite Systems, Inc.*, 101 F.3d 346 (4th Cir.1996) (citing the 8th Circuit), *cert. denied*, 520 U.S. 1240, 117 S.Ct. 1844, 137 L.Ed.2d 1048 (1997). Plaintiff does not respond to this contention. In accordance with the law of this circuit, this Court finds that Plaintiff's lifting restriction does not significantly impair a major life activity under the ADA.

Plaintiff is restricted from excessive bending, pushing, or pulling in the workplace. But Plaintiff provides no indication of what "excessive"means. The Court agrees with Defendant's common sense contention that an inability to perform such activities to excess is a common trait of all people. Plaintiff cites no law to indicate that Plaintiff's restrictions place him within the ADA's purview. These contentions do not make Plaintiff disabled under the ADA. The evidence cited by Plaintiff from Dr. Raughton also finds that Plaintiff cannot "walk a golf course" or jog.[65] Plaintiff's legal support for how these contentions support his ADA claim is absent. There is no evidence that jogging is a major life activity; many people who cannot jog are not disabled. There is no evidence to support that the inability to walk a golf course constitutes a disabled condition. Defendant's Reply notes that Plaintiff can take 30–minute or longer walks every day in the morning, and can do some household chores.[66]

---

59. *See* Deposition of Dr. Richard Raughton, Pl's App. at 82.

60. Pl's App. at 78.

61. Pl's App. at 78–79; Plaintiff's Response at 15.

62. Def.'s App. at 196.

63. *Id.*

64. *Id.*

65. Pl's App. at 79.

66. Deposition of Steve Middleton, Def.'s App. at 36–39.

Dr. Raughton's letter opines that Plaintiff should not pursue a job which would require driving farther than 25–30 miles.[67] First, Plaintiff shows no legal support to show that driving is a major life activity. The examples of "major life activities" available to this court represent the most basic of tasks, such as "reaching" and "walking." The Court cannot conclude from the examples listed above that a complex task such as driving rates as a "major life activity" the same as the other simple activities listed above. Indeed, such a finding would compel the Court to rule that anyone who has a substantial impairment in driving would have a disability under the ADA; the Court sees little logic or common sense in this conclusion, and certainly has seen no case support from Plaintiff. Plaintiff's doctor attempts to bring driving within the class of major life activities by suggesting we spend 15% of 20% of our time in a car, a figure that, even in Dallas, seems exaggerated. Further, the examples of major life activities listed above do not focus on the length of time spent on the activity, but rather their basicness to our existence as humans (e.g. breathing, speaking, learning). Even if driving is a major life activity, Plaintiff is not substantially limited, as he can still drive; he simply should not drive more than 25 or 30 miles at a time. Plaintiff's doctor does not tell us how long a recovery period the plaintiff would require (e.g. whether getting out to stretch would be sufficient to allow Plaintiff to continue). Nor does Plaintiff cite support to show that such a distance represents a substantial impairment of life activity, other than the doctor's bald assertion, nor does he discuss what the average or reasonable time is that a driver can drive without stopping. The driving restriction only applies to Plaintiff's job, which presumably would entail a daily commute of the distance twice per day. There is no evidence that the average person does not commute more than 25 or 30 miles per day, nor does Plaintiff argue to the contrary. With perhaps 2000 square miles or more within Plaintiff's immediate sphere of driving, Plaintiff does not show any impairment in his life. Lastly, the Court notes that the doctor's written letter tempered his advice by stating that such driving would "compromise his fragile lower back injury" and "would not be beneficial in the long run for [Plaintiff];"[68] this statement strangely stops short of saying such driving would harm Plaintiff. Nor is there evidence from Plaintiff showing that the lack of beneficial effect of driving is any different than for the average person with whom Plaintiff is compared.

Plaintiff's brief also claims that Plaintiff has a "20% impairment rating," which appears in the Plaintiff's signed Declaration.[69] But Plaintiff's brief does not explain the meaning of this statement or how it affects the analysis of whether Plaintiff is disabled.

Defendant also contends, without response from Plaintiff, that just because Plaintiff may not have been able to perform the job of floor person/apprentice operator, for which changing the molds was an essential function, that fact alone does not establish a substantial limitation on the life activity of working. The Supreme Court has stated that "the inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *See Sutton v. United Air Lines*, 527 U.S. 471, 493, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), *citing* 29 C.F.R. § 1630.2(j)(3)(i). Plaintiff does

---

67. Pl's App. at 82.

68. Pl's App. at 82.

69. Declaration of Steve Middleton, Pl's App. at 3.

not dispute Defendant's contention that there are "a myriad" of other manufacturing jobs, including ones at Ball–Foster in the cold end, that are consistent with the restrictions upon Plaintiff.[70]

Plaintiff has not demonstrated through his brief that he has an impairment that substantially limits one or more major life activities. Therefore, he is not disabled under the ADA.

Defendant similarly challenges Plaintiff's contention that he has a record of disability, which would qualify Plaintiff under the ADA. This Court agrees with Defendant's challenge to the inadequacy of Plaintiff's showing of a record of disability. Plaintiff cites no evidence that Plaintiff's record differs at all from his contentions of disability, which the Court has already found to be legally insufficient. Therefore, Plaintiff has failed to show a record of disability.

■■■ Defendant also challenges whether Plaintiff was regarded as having an impairment under the ADA. Since the Court held as a matter of law that being unable to work the single floor person/apprentice operator position did not render Plaintiff disabled, then *a fortiori* Defendant's belief that Plaintiff could not work solely that position would not render Plaintiff "regarded" as disabled under the ADA.

To combat Defendant's claim, Plaintiff rests primarily on the contention that if Defendant was willing to put Defendant to work in other positions, it would have done so long before August 2, 2000. Plaintiff notes that Defendant declined to do so even though Plaintiff's doctor performed an FCE, and released Plaintiff for work after specifying other jobs he could perform in the cold end. Plaintiff cites the position of Defendant's employee Julia Kirchner that Ball Foster was concerned about liability in the event that Plaintiff could not safely perform his job.[71] Plaintiff's delay in returning to work is not disputed.

The Court looks for guidance to the *Colwell* case. *See Colwell v. Suffolk County Police Dept.,* 158 F.3d 635, 647 (2d Cir.1998). The Court there entered summary judgment for the Defendants, finding that requiring the plaintiff candidates for promotion to submit to physical examinations, even where others were not required to do so, provided no basis that they were regarded as disabled where plaintiffs had earlier insisted that their physical limitations restricted what work they could perform. *Id.* at 647. The Court stated, "The fact that the County perceived a need to require the exams suggests no more that that their physical condition was an open question." *Id.* This case is instructive but not controlling, since the physical examinations in question evidently applied only to a specific job for which the plaintiffs had applied. *See id.* In our case, Plaintiff could have been regarded as disabled for a wide range of jobs within Ball Foster.

It is a close question as to whether a jury could reasonably infer that Defendant regarded Plaintiff as disabled. It is conceivable that Defendant simply did not know whether Plaintiff was disabled, but did not necessarily regard him as such. Yet the Court concludes that Defendant's refusal to return Plaintiff to work in a wide range of jobs in the plant before receiving further medical testing or analysis, given that Plaintiff had already submitted evidence of his ability from his doctor, could reasonably support the inference that Plaintiff was regarded as disabled by Defendant. A jury would be entitled to disbelieve Defendant's contention that its refusal to permit Plaintiff to return to work

---

**70.** Def's Brief at 13.

**71.** Pl's App at 27.

was based on liability concerns rather than discrimination against someone that Defendant regarded as disabled. The jury must consider the question of whether Defendant regarded Plaintiff as disabled. Of course, just because there are no jobs available that fit Plaintiff's restrictions does not mean Plaintiff is regarded as being excluded from an entire class of jobs (and thus as disabled). *Pryor,* 138 F.3d at 1028.

The Court notes that, given Defendant's plausible reasons for requiring another medical examination and Plaintiff's intransigence in granting it, the evidence appears to strongly favor Defendant on the issue of whether Defendant discriminated against Defendant based on any disability he was regarded as having. The Fifth Circuit considered a claim that, assuming that the defendant considered the plaintiff to be disabled, the defendant had refused to place her in jobs that might have been available. *Deas v. River West, L.P.,* 152 F.3d 471, 481 n. 23 (5th Cir.1998). The Court required evidence that other jobs were available and that the plaintiff had applied for them (*Id.*); the evidence of other available jobs in this case would support such a contention. But Defendant does not argue for summary judgment based on Defendant's conduct toward someone it may have regarded as disabled; accordingly, the court will not consider such evidence.

 To be covered under the ADA, Plaintiff must also be a "qualified individual with a disability." 42 U.S.C. § 12111(8); *Turco v. Hoechst Celanese Corp.,* 101 F.3d 1090, 1092 (5th Cir.1996). Such an individual, "with or without reasonable accommodations can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *Turco,* 101 F.3d at 1092.

The Court considers the floor person/apprentice operator position that Plaintiff desired. It is undisputed that changing the molds is an essential part of the position, and that Plaintiff could not perform the function on his own. Plaintiff must thus prove he could do the job with reasonable accommodation. The accommodation suggested by Plaintiff's chiropractor of having another employee help Plaintiff change the molds is unreasonable as a matter of law. Eliminating an essential function of a job or redefining essential roles so that another employee substitutes for the disabled employee is not a reasonable accommodation. *See Bradley v. University of Texas M.D. Anderson Cancer Center,* 3 F.3d 922, 925 (5th Cir.1993) (construing Rehabilitation Act of 1973);[72] *Newman v. Chevron, U.S.A.,* 979 F.Supp. 1085, 1091 (S.D.Tex. 1997); *Johnson v. City of Port Arthur,* 892 F.Supp. 835, 842 (E.D.Tex.1995). Defendant argues that even if accommodation was legally required, Defendant could not reasonably do so. Defendant contends it could not reasonably pass Plaintiff's mold changing responsibilities in the hot end to others.[73] Dennis Worrell, the plant Operations Manager, testified that having a floor person always on hand for Plaintiff is not feasible to the plant's operation since there is only one floor person who works during the day, and none work at other times.[74] The function of upkeep personnel is to relieve other personnel (presumably the operators) and to keep the hot end clean; they also occasionally change the molds.[75]

---

**72.** *See also Sutton,* 527 U.S. at 497, 119 S.Ct. 2139 (" The [ADA's] definition of disability is drawn almost verbatim from the Rehabilitation Act of 1973") (internal quotes omitted).

**73.** Def's App. at 268–272.

**74.** Def's App. at 268–271.

**75.** Def's App. at 268–272.

Plaintiff contends that Defendant's arguments fail for three reasons. First, when Osborn placed the "no mold changing" restriction on him, he did not realize that the molds did not have to be changed in one piece, but rather could be changed after breaking them down into three pieces which would each weigh no more than Middleton's 25–pound lifting restriction. This contention is unavailing, since Plaintiff has not shown that Defendant knew exactly why Middleton's doctor placed the no mold changing restriction on him. The evidence in the case indicates that Defendant was continually requesting more specific information than what it received. Further, even though Dr. Osborn testified that the floor person job was lighter than he had envisioned, Plaintiff's evidence of the weight of the plates is unclear that they were within the 25–pound limit; the 32–ounce mold broke down to a 24 pound piece, while the 40 ounce mold weighed a little more, according to Plaintiff's brief.[76]

Plaintiff's second refutation is that an "upkeep" was regularly available to assist with duties such as mold changes, so no additional work would be imposed on others. This statement is self-contradictory, since obviously anyone assisting Plaintiff would be doing work that they otherwise would not have done. As discussed above, it is not reasonable that another employee should have to assist Plaintiff every time he must change a mold, as would evidently be the case, nor is it even practical given that upkeep personnel act in relief of others, not as assistants to floor personnel.

■ Third, Plaintiff states that "the otherwise qualified" requirement is not limited to the former job, and there were at least five other "cold end" jobs identified by Middleton's doctor which Middle-

ton could have performed. Plaintiff claims that light duty was available, at Defendant's discretion, during 1998 and 1999; the record implied that two weeks' light duty might have been available.[77] Plaintiff cites no law for this contention that Defendant must place Plaintiff in another job, and this Court believes the legal authority to lean the opposite direction. An employer has no duty to reassign the employee to any particular job, although it could not deny him alternative employment opportunities reasonably available under the employer's existing policies. *See School Board of Nassau County v. Arline,* 480 U.S. 273, 289 n. 19, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987) (Rehabilitation Act); *Bradley,* 3 F.3d at 925. Creating a new job or changing an employee's essential functions, such as switching him to light duty when he has been a laborer, is not a reasonable accommodation. *See Port Arthur,* 892 F.Supp. at 842 (finding such changes to be a different job, not an accommodation of employment). Thus, since Plaintiff could not be reasonably accommodated in his former job, Defendant was not obligated to place him in another job, including light duty.

Defendant could not prevent Plaintiff from obtaining another job in the cold end for which he might be qualified. But Plaintiff fails to show that any of the cold end jobs that his doctor cleared him to take were actually available at the plant under Ball–Foster's existing policies. For March 1998, we have only Middleton's bare assertions that a repack or line attendant job was available.[78] The evidence cited by Plaintiff to show the availability of light duty jobs is unhelpful, for the jobs appeared to be merely temporary odd jobs given to employees with minor injuries.[79]

---

76. Pl's App. at 37–39, 43–44. The Court does not see the discussion of the 40–ounce mold.

77. Pl's App. at 29–30.

78. Pl's App. at 4.

79. Pl's App. at 40–44.

Plaintiff also misquotes a witness as saying that a Mr. Martinez had worked longer than two weeks on light duty, when the context makes fairly clear that the witness said that he didn't know.[80] The one witness who comes close to showing that jobs were available for Plaintiff is employee and union officer Darrell Grounds, but in claiming that Middleton's seniority would have put him in a position where he could have been called in part time, Grounds admits he only knew Plaintiff's seniority approximately;[81] there is no showing that Plaintiff was not given a job that a more junior employee received. According to Grounds, employees were being recalled from layoff; the evidence is insufficient to show Middleton's proper order in being recalled.[82] Grounds testified that even with his level of seniority; Plaintiff would not have been able to protect his job from layoff.[83] The mere fact that people were working light duty jobs is of no consequence. Defendant's position was that Plaintiff did not have enough seniority to take a cold end job.[84] This contention is supported by Defendant's offer to return Plaintiff to work in the cold end once his seniority or experience was sufficient and a position was available, and once Defendant was satisfied as to Plaintiff's safety.[85]

Plaintiff's suggestion conflicts with the limited purpose of light duty stated by Julia Kirchner. Light duty is discretionary and is intended to ease injured employees back to work who evidently will be returning to full work soon; but Defendant's Julia Kirchner testified that she understood Plaintiff to have a permanent restriction that would prevent him from doing his job.[86] Thus, given the rationale behind light duty as a temporary stop before returning to regular work, there was no reason to use temporary work to ease Plaintiff back into a job he could never return to or which was not available given his seniority.

Plaintiff also contends as a legal matter that after an employer knows of a disability and the employee requests accommodation, if the employer fails to engage in a dialogue to determine what accommodations are necessary, they have failed to reasonably accommodate under the ADA. *See Loulseged v. Akzo Nobel, Inc.,* 178 F.3d 731, 735–36 (5th Cir.1999). But since this Court found that Plaintiff is not otherwise qualified under the ADA, there is no reasonable accommodation, and thus no need for discussion. The Court is very skeptical whether this claim would survive summary judgment even if accommodation were necessary given Defendant's abundant communications with Middleton.

## 2. ADA RETALIATION CLAIM

The ADA prohibits an employer from discriminating against an employee who has made a charge or participated in a proceeding under this act. See 42 U.S.C.A. § 12203. "To show an unlawful retaliation, a plaintiff must establish a prima facie case of (1) engagement in an activity protected by the ADA, (2) an adverse employment action, and (3) a causal connection between the protected act and the adverse action." *Seaman v. CSPH, Inc.,* 179 F.3d 297 (5th Cir.1999). "Once the plaintiff has established a prima facie case, the defendant must come forward with a legitimate, non-discriminatory rea-

---

80. Pl's App. at 44. Darrell Grounds did testify to this fact. Pl's App. at 71.

81. Pl's App. at 67–71.

82. *Id.*

83. *Id.*

84. Def's App. at 234.

85. Def's App. at 248.

86. *Id.*

son for the adverse employment action." *Id.* If such a reason is advanced, the plaintiff must adduce sufficient evidence that the proffered reason is a pretext for retaliation, and must show that "but for" the protected activity, the adverse employment action would not have occurred. *Id.*

According to the interrogatory answers cited by Defendant, Plaintiff claims that Defendant retaliated against him by not permitting him to return to work when he wanted, refusing to make accommodations for him to return to work on light duty, and giving him verbal and written discipline beginning in January 1998 after placing him on a machine with which he was not familiar.[87] Defendant disputes the third prong of the test for retaliation: whether there is a causal connection between Plaintiff's actions protected by the ADA and the Defendant's actions complained of above.

■ The Court will assume *arguendo* that Plaintiff has made a *prima facie* case. Defendant again explains its refusal to return Plaintiff to work where he wished by citing the "confusing and contradictory information" from Plaintiff's chiropractor, and Plaintiff's failure to cooperate with Defendant to allow his FCE to be given to Baylorworx for comparison with the functions of the various jobs in issue. The Court also recalls Defendant's liability concerns in allowing an injured employee to return to work he could not handle. Having produced a non-discriminatory reason for its actions, the burden shifts to the Plaintiff to show that these reasons are a pretext for retaliation. The Court notes that Plaintiff does not argue that Plaintiff's threatened 3–day suspension was retaliation by Defendant.

Plaintiff further cites Defendant's continual "delay tactics" in requiring progressively more information from Plaintiff without tangible results in Plaintiff's employment. Plaintiff asserts that he submitted four work releases in mid–1998 before Defendant inquired with Plaintiff's doctor as to which jobs he could handle.[88] Plaintiff cites Dr. Osborn's identification of 5 or 6 jobs Plaintiff could perform, followed by Kirchner's refusal to permit Plaintiff to return to work and request for more specific information and an FCE, followed by further requests for information, including a medical release form, which Plaintiff contends he provided.[89]

The Court cannot discern any attempt at retaliation against Plaintiff. Defendant had a legitimate concern about the safety of Middleton and the liability of Ball–Foster should Middleton be hurt again in a job for which he was not qualified. It was thus reasonable for the Defendant to desire medical evidence of Plaintiff's capacity to work in his previous job or any other job within the plant. Defendant's reluctance to accept the opinion of Dr. Osborn is entirely reasonable in light of his abrupt change in diagnosis of Plaintiff from permanently disabled to temporarily restricted from work. This change coincided with the denial of Plaintiff's application for permanent disability benefits: Plaintiff applied for permanent disability benefits on April 15, 1998, but only a few weeks later on May 8, 1998, Dr. Osborn radically changed his diagnosis. It was reasonable for Defendant to suspect that the change in diagnosis might have resulted from Dr. Osborn's knowledge that Plaintiff's benefits application had been denied. A merely temporary restriction might also have made Plaintiff eligible for light duty. De-

---

**87.** Def's App at 173.

**88.** Def's App. at 114, 196, 198–99.

**89.** Pl's App. at 14.

fendant was justified in seeking a second, independent opinion and had ample reason to do so. Defendant's request was not intended to unduly obstruct Plaintiff's return to work; when Plaintiff objected to Defendant's suggestion that Baylorworx perform Middleton's FCE, Defendant acceded to Plaintiff's request and permitted Sargent to perform the FCE. It was only when it became apparent that the Sargent FCE was based upon the opinions of the same Dr. Osborn that Defendant pressed for another, truly independent evaluation. The Court notes that Defendant frequently initiated the correspondence between the parties, indicating a willingness to resolve the questions of Middleton's fitness for work.

It is not clear that in March 1998 Plaintiff requested anything other than his old job in the hot end, for which it is not refuted that Plaintiff's ability to work the hot end job was affected by his condition. It is reasonable that Defendant would not look for another similar job when Plaintiff was found to be permanently disabled from working that job. Plaintiff did not adequately show eligibility for any cold end jobs based either on his ability, his seniority, or the availability of those jobs. Defendant was willing to drop its request for an independent FCE, but still wanted their doctors at Baylorworx to evaluate Plaintiff's earlier FCE results. Defendant's caution in seeking a release from Plaintiff for Baylorworx to view Plaintiff's FCE and medical records is reasonable, as Defendant clearly felt it needed a release for the FCE itself in addition to any general release that may have existed. It is not just Defendant who caused delay in Plaintiff's return to work; Plaintiff delayed in responding to Defendant's requests, and quarreled with whether a release had been given but refused to simply grant a new release. Defendant initiated Plaintiff's eventual return to work in the cold end.

Even if Plaintiff's alleged facts are believed, the Court cannot conclude that a reasonable jury could find that Plaintiff had fulfilled his burden of proof.

## D. WORKER'S COMPENSATION RETALIATION CLAIM

▪ Defendant moves to dismiss Plaintiff's worker's compensation retaliation claim under Texas Labor Code § 451.001. A person may not discharge or in any other manner discriminate against an employee because the employee has: (1) filed a workers' compensation claim in good faith; (2) hired a lawyer to represent the employee in a claim; (3) instituted or caused to be instituted in good faith a proceeding under the Texas Workers' Compensation Act; or (4) testified or is about to testify in a proceeding under the Act. *Id.* A causal connection is established between a plaintiff's protected action and a defendant's retaliation if but for the employee's action, the adverse employment action would not have occurred when it did. *See Continental Coffee Products v. Cazarez*, 937 S.W.2d 444, 450–51 (Tex. 1996). The employee need not prove that participation in the protected activity was the sole cause for the adverse employment action. *Id.* at 451 n. 3. The causal connection may be established by circumstantial evidence or by the reasonable inferences drawn from the evidence. *Id.* at 451. Once the causal link is established, the employer must rebut the allegation by showing a legitimate reason for the discharge. *Id.* Evidence that an employer's stated reason is false could support a finding of a violation of the statute. *Id.* at 452.

▪ The Court finds much of the same evidence that was probative to the ADA retaliation claim to apply to the Worker's Compensation retaliation claim as well. Consequently, the Court will not rehash the entire discussion. In support of this

state law claim, Plaintiff cites Defendant's failure to return him to work for two years as a violation of company policy. The delays in Plaintiff's return to work have already been fully addressed. But Plaintiff's claim cannot stand for a further reason. The connection between the filing of Plaintiff's worker's compensation claim and the actions of Defendant are far too attenuated to support a judgment in Plaintiff's favor. Plaintiff filed his claim in September of 1996. Yet there is no evidence that this claim hindered Plaintiff's return to work in early January 1998 after his recuperation. Defendant's actions in not returning Plaintiff to work did not occur until after Plaintiff's injury flared up again shortly after returning to work, and he began seeing Dr. Osborn. The events are too remote in time and circumstance to support Plaintiff's claim.

Plaintiff cites generally Defendant's negative attitude toward Plaintiff during the two years after he returned to work from surgery, left again, and sought reinstatement; manifestations of such attitude included verbal and written warnings. Expression of a negative attitude toward Plaintiff's injured condition or the failure to adhere to established company policies can support the finding of a causal connection. *See Paragon Hotel Corp. v. Ramirez,* 783 S.W.2d 654, 658 (Tex.App.1989). But Plaintiff admitted in his deposition that he could think of no other reason for his warnings other than that he did not do a good enough job cleaning up.[90] Defendant notes that there is no evidence that anyone commented about Plaintiff's claim specifically or reacted negatively to it.

The Court holds as a matter of law that no reasonable jury could find that Defendant unlawfully retaliated against Plaintiff and would not have acted as it did but for Plaintiff's filing of a claim.

90. Def's App. at 27–29.

## CONCLUSION

Having carefully considered the parties' arguments, the summary judgment evidence, and pertinent authorities, the Court concludes that Defendant's Motion to Dismiss should be DENIED, and Defendant's Motion for Summary Judgment should be GRANTED against all of Plaintiff's claims.

**So Ordered.**